DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant Tish Secession has appealed from an order of the Summit County Common Pleas Court, Juvenile Division, that terminated her parental rights and awarded permanent custody of her children, Ray Dawn Evens and Quartyis Secession, to the Summit County Children Services Board. This Court affirms.
 I.
Tish is the mother of six children. The minor children at issue in this case are Ray Dawn Evens and Quartyis Secession. On June 25, 1997, the Summit County Children Services Board (CSB) received a complaint alleging that Ray Dawn and Quartyis were dependent and neglected children. The juvenile court granted CSB emergency temporary custody of both children.
On September 4, 1997, the children were adjudicated neglected. CSB was given temporary custody of the children, and they were placed in foster care. On October 8, 1998, CSB moved for permanent custody of the children. Prior to the dispositional hearing in this matter, Patricia Secession, the children's maternal grandmother, moved the juvenile court for an order granting her legal custody of the children. Tish supported Patricia's motion for legal custody.
A trial was held on January 4 and 6, 1999. At trial, Tish did not attempt to rebut the substantial evidence of her unfitness as a mother. Essentially, she conceded the evidence of her history of drug abuse, criminal convictions, emotional and psychological problems, and the neglect of her children. She, however, argued against CSB's motion for permanent custody, asserting that legal custody of the children should be granted to Patricia.
On January 25, 1999, the juvenile court denied Patricia's motion for legal custody. The juvenile court terminated Tish's parental rights and awarded CSB permanent custody of the children. Tish timely appealed, asserting one assignment of error.
 II. The judgment of the trial court denying the motion for legal custody to the grandmother and instead granting permanent custody to the Children's (sic) Services Board was against the manifest weight of the evidence.
In her sole assignment of error, Tish has asserted that the trial court's denial of Patricia's motion for legal custody was against the manifest weight of the evidence. This Court disagrees.
 A. Standing
Initially, this Court must determine whether Tish has standing to assert that the trial court's denial of Patricia's motion for legal custody was in error. CSB has asserted that, pursuant to this Court's holding in In re Ball (Apr. 21, 1999), Summit App. Nos. 19158 and 19178, unreported, at 16, Tish does not have standing to bring the instant appeal. CSB's argument is without merit.
In Ball, the appellant asserted that the trial court's denial of the maternal grandmother's motion for legal custody was against the manifest weight of the evidence. This Court determined that the appellant was attempting to present an issue that could only be properly raised by the maternal grandmother. Id. at 16. This Court noted that an appellant may not challenge an alleged error committed against a non-appealing party absent a showing that the appellant herself has been prejudiced by the alleged error.[1]
This Court, therefore, concluded that, because the appellant failed to show that she had been prejudiced by the trial court's denial of the motion for legal custody, she lacked standing to assert that denial as error on appeal. Id.
However, prior to Ball, this Court had reached the opposite conclusion. In In re Dye (Apr. 19, 1995), Summit App. Nos. 16927 and 16932, unreported, the appellant asserted that the trial court erred by granting permanent custody to CSB instead of awarding temporary custody to a member of his family. This Court noted that the denial of custody to another party would ordinarily not be appealable by the appellant because he was not a party to the motion for custody. This Court determined, however, that because the trial court's denial of the motion for legal custody prejudicially affected the appellant's rights he had standing to appeal that ruling. Id. at 5, fn. 2.
The determination in Dye that the father had standing was based on the reasoning set forth in In re Hiatt (1993), 86 Ohio App.3d 716. The Fourth District Court of Appeals determined that the appellant had standing to assert that the trial court erred by granting permanent custody when suitable relatives were available to accept legal custody. Id. at 722. The Hiatt court reasoned that, if the trial court had granted legal custody to one of the appellant's relatives, rather than granting permanent custody to the children's services agency, the appellant would have retained residual parental rights, privileges and responsibilities.[2]Id. However, by denying the motion and granting permanent custody to CSB, the court divested him of all his parental rights.Id. Therefore, the Hiatt court determined that the appellant was prejudiced by the trial court's ruling to the extent that it affected his residual parental rights. Id.
This Court does not agree with the holding in Ball that a parent lacks standing to challenge a trial court's denial of a motion for legal custody. Instead, this Court adopts the reasoning set forth in In re Hiatt (1993), 86 Ohio App.3d 716, and therefore, reinstates the previous rule set forth by this Court inDye. Dye, supra, at 5, fn. 2. Accordingly, Tish does have standing to assert on appeal that the trial court erred by denying Patricia's motion for legal custody.
 B. Termination of parental rights.
When a child is not orphaned or abandoned, termination of parental rights is governed by R.C. 2151.41.4(B), which provides, in pertinent part:
 The court may grant permanent custody of a child to a movant if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 (1) The child is not abandoned or orphaned and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
Accordingly, before a juvenile court can terminate parental rights and award permanent custody of a child who is neither abandoned nor orphaned to a proper moving agency, it must find by clear and convincing evidence that: (1) the grant of permanent custody to the agency is in the best interest of the child; and (2) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. See In re William S.
(1996), 75 Ohio St.3d 95, 99; see also, R.C. 2151.41.4(B)(1).
Tish has not challenged the trial court's finding that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. Instead, she has asserted that the trial court's finding that the grant of permanent custody to the agency was in the children's best interests was against the manifest weight of the evidence.
When evaluating whether a judgment is against the manifest weight of the evidence in a civil context, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), Summit App. No. 18983, unreported, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175; see, also State v.Otten (1986), 33 Ohio App.3d 339, 340. Accordingly, before an appellate court will reverse a judgment as against the manifest weight of the evidence in a civil context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
When a juvenile court determines the best interest of a child, for purposes of ruling on a motion for permanent custody, it is required to consider all relevant evidence, including, but not limited to:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child; [and]
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
R.C. 2151.41.4(D). The willingness of a relative to care for the child does not alter what a court considers in determining permanent custody. In the matter of Mastin (Dec. 17, 1997), Lorain App. Nos. 97CA006743 and 97CA006746, unreported, at 7.
In a dispositional hearing, the juvenile court has the discretion to award legal custody to either parent or any other person who files a motion requesting legal custody. See R.C. 2151.35.3(A)(3). However, this Court has held that R.C. 2151.35.3 does not require the juvenile court to consider placement with a relative before granting permanent custody. Dye, supra, at 5. The juvenile court, therefore, was not required to find by clear and convincing evidence that Patricia was an unsuitable placement option.
Accordingly, it was within the juvenile court's discretion to determine whether to place the children with Patricia. A reviewing court will not reverse the judgment of a juvenile court absent an abuse of discretion. In re Pieper Children (1993),85 Ohio App.3d 318, 330. To constitute an abuse of discretion, a trial court's action must have been arbitrary, unreasonable, or unconscionable. State ex rel. The V Cos. v. Marshall, (1998),81 Ohio St.3d 467, 469.
This family has an extensive history of CSB involvement. The first referral on the family was received in December 1985. The referral concerned the possible neglect of Tish who at the time was fourteen years old and pregnant. CSB provided the family with support services for a short period of time. In April 1986, CSB again became involved with the family. Tish had given birth to her first child, Laquia. Patricia was providing the majority of care for Laquia. There was a concern with Tish not attending school and not obeying the rules set forth by Patricia. CSB encouraged Patricia to seek legal custody or guardianship of Laquia.
In September 1986, CSB received a referral alleging neglect or lack of supervision against Patricia. Tish was not enrolled in school, her brothers were destructive to property in the neighborhood, and the family had a chronic problem paying the utility bills. Services were offered to the family, but the recommendations were not followed through.
In October 1986, Patricia requested legal custody of Laquia. CSB sought temporary custody and granted physical custody to Patricia. In April of the following year, Patricia was granted legal custody of Laquia. CSB continued to provide services to the family due to its concerns that Patricia continued to give Tish responsibility for Laquia. The case was closed in July 1987.
In 1988, Tish was released from a youth detention facility for three months to give birth to her second child, China. When Tish was returned to the youth facility, China remained in Patricia's care. In 1989, the youth detention facility requested CSB to conduct an evaluation of Patricia's home. The facility was considering releasing Tish, who was then 17, into Patricia's custody. Patricia had requested that Tish be released early because she was mentally and physically exhausted with the care of Tish's children. Shortly after her release, Tish was returned to the facility for failing to report to her probation officer. CSB continued to provide services to the family. CSB was concerned because Patricia did not seem to understand that she had legal custody of Laquia, and because Patricia continued to want her daughter home to care for the children.
In July 1989, CSB was awarded temporary custody of China. CSB placed China in Patricia's physical custody. In January 1990, Patricia received legal custody of China. However, in July of 1990, Patricia requested the juvenile court to find an alternative placement for China because she was no longer able to care for her. As a result, China was placed with a foster family.
In October 1990, CSB received another request for an assessment of Patricia's home. Tish was pregnant with her son, Darnell, and was about to deliver. The Franklin County Pre-Release Center was attempting to find a placement for him once he was delivered. CSB did not recommend Patricia for placement because she had just surrendered custody of China, and CSB did not want to overwhelm her. Therefore, Darnell was placed with Linda Taylor, Patricia's sister. CSB was subsequently granted temporary custody of Darnell; however, he remained in Ms. Taylor's physical custody. In June 1991, CSB became aware that Ms. Taylor had given Darnell to Patricia. Darnell remained in Patricia's physical custody with CSB having temporary custody. In December 1991, CSB terminated its temporary custody of Darnell; however, it retained protective supervision.
In September 1991, Tish was released from jail and was residing with Patricia. At that time, CSB established a case plan for Tish. On December 5, 1991, Tish gave birth to Quartyis. Tish requested custody of China during February 1992. When the juvenile court reviewed the matter in August 1992, Tish had been sentenced to a community based correctional facility for probation violations and was not due to be released until October. Accordingly, the juvenile court denied Tish's request.
On December 15, 1992, Tish was granted custody of China. At that time, she appeared to be drug free and was making progress in her case plan. In February 1993, CSB's protective custody of Darnell was terminated, and CSB's case was closed. On July 28, 1993, Tish gave birth to Ray Dawn.
In July 1994, CSB received a referral alleging neglect and lack of supervision against Patricia. Tish had been incarcerated again, this time, on a charge regarding stolen property. The referral was closed as unsubstantiated; however, it was noted that Patricia stated that she was caring for the children only until Tish was released from jail.
In April 1995, CSB received a referral alleging neglect by Tish. The referral stated that the children were home alone, that the mother left them home alone all the time, and that there was little, if any, food in the home. Approximately two or three days later, a similar referral was received from a different referent. The case was closed as unsubstantiated because Tish refused entry to the caseworker and refused services.
In November 1995, CSB received a referral regarding Tish. Akron City Hospital informed CSB that Tish had tested positive for cocaine while she was pregnant with her sixth child, Tomorrow. In February 1996, CSB received another referral because Tish had tested positive for cocaine at the time of Tomorrow's birth. Tomorrow was eventually released to Tish, and the case was closed, with neglect indicated.
In March 1996, CSB became involved again because Tish had discontinued her cooperation with the visiting nurse who had been checking on Tomorrow. Neglect was substantiated, and the case was opened for ongoing services. Shortly after Tomorrow's birth, Tish was again incarcerated. Sandra Wiggins, Patricia's sister, was given legal custody of Tomorrow. Ray Dawn and Quartyis were placed in Patricia's physical custody on March 25, 1996.
In April 1996, CSB began working with Patricia. At that time, Laquia, China, Darnell, Quartyis, and Ray Dawn were in her care. CSB provided Patricia with bus passes and food and referred her to parenting classes. Patricia was having difficulty providing structure in the home, i.e. consistent mealtimes, appropriate bedtimes, and setting limits for the children. Her caseworker, Todd Kutzera, testified that Patricia did not follow through with his recommendations for providing structure in the home. Mr. Kutzera testified that, although she spoke positively of her grandchildren, Patricia was often frustrated by the responsibility of caring for five children.
On May 13, 1996, Mr. Kutzera spoke with Tish at Patricia's residence. He referred her to the Community Drug Board for treatment. Tish did attend a drug and alcohol assessment, but she did not follow through with the treatment. He again discussed the topic of treatment with Tish on June 4, 1996; however, shortly thereafter, she disappeared for several months. In November 1996, Patricia was given legal custody of Ray Dawn and Quartyis with protective supervision to CSB. The case was closed on April 19, 1997. CSB's protective supervision terminated on June 2, 1997.
On June 23, 1997, CSB received a referral alleging neglect. Akron Police officers went to Patricia's home based on a report of loud music. The officers found Darnell alone in the home. The home was in a deplorable condition and a gas burner was on, but not lit. Darnell was removed from the home and placed with a relative. Mr. Kutzera went to the home on June 25, 1997. At that time, Tish, Ray Dawn, and Quartyis were in the home. Tish informed Mr. Kutzera that Patricia had been residing with a relative for a couple of weeks because she needed a break.
When Mr. Kutzera spoke with Patricia, she informed him that she wanted to see if Tish could manage with the boys. He asked her to return to the home to assist in cleaning it up and resume responsibility for the children. He testified that the residence was in a deplorable condition. The bathtub was filled with what appeared to be soiled water, urine, and feces. There was urine and feces on the floor, clothes strewn about, and food on the floor. Patricia refused to come back and take responsibility for the children.
CSB removed the children and sought emergency temporary custody. Subsequently, CSB received temporary custody of the children and placed them in foster care. When initially placed in the foster home, both boys exhibited "acting-out" behaviors. At the hearing, however, the testimony established that the children had flourished while in foster care.
Ray Dawn, who was four years old at the time CSB received temporary custody, was described as physically aggressive. He spoke in terms of killing people if they "messed with him" and he had altercations with his peers. He also had a problem with enuresis. A counselor assessed him as having indicators of a potential for attention deficit hyperactive disorder and indicated that if his violent behaviors could not be controlled, he may need to be medicated. As a result, Ray Dawn received counseling from January 1998 to August 1998.
At the time of the hearing, Ray Dawn was described as active, but not beyond normal limits for his age. He responds very well to verbal commands to correct his behavior. He has had no problems in school with his behavior, attendance or grades. His problems with the enuresis and physical altercations had resolved. Although he has been diagnosed as having a high activity level, his behaviors do not require medication.
Quartyis, who was six at the time CSB received temporary custody, was described as violent and disruptive. There was testimony that he urinated on another child as well as on a radiator and the floor. He was also assessed by a counselor as having indicators of a possible attention deficit hyperactive disorder and impulsive behavior. While in foster care, he received counseling to deal with his aggression. Initially, he had difficulty adjusting to the structure of the classroom. He would get up and walk around whenever he felt like it. However, his behavior has improved greatly. He is doing well in school and appears to enjoy learning. Further, he has learned to stop and think before he acts instead of immediately acting aggressively.
The testimony established that Ray Dawn and Quartyis had no bond with their mother. Moreover, they had not seen their mother for at least two years prior to the hearing. Although there was overwhelming testimony that the children were bonded with each other, their siblings and their grandmother, there was also significant testimony that the children had bonded with their foster family. In fact, the children referred to their foster parents as "Mom" and "Dad," whereas, they referred to their natural mother as "Tish."
CSB attempted to place the children with Ms. Wiggins, who already had legal custody of Darnell and Tomorrow. Ms. Wiggins, however, was unable to handle all four children. CSB also attempted to find other relatives who would be able to take custody of the children. No suitable relatives came forward prior to the hearing. CSB felt that a grant of permanent custody to the agency would be in the children's best interest. CSB planned to seek an open adoption for the children so that the relationship with their siblings could be continued.
Substantial testimony was offered regarding Patricia as a possible legal guardian. Although the evidence presented showed that Patricia had consistently worked on her case plan, she was not in good health. Due to a kidney disease, Patricia had an on-going need for dialysis three times a week. Her condition often left her feeling weak and tired.
In addition to having legal custody of Laquia and China, there was also testimony that Darnell spent weekends with Patricia on a regular basis. Further, the family was attempting have legal custody of Darnell granted to Patricia. Although, two relatives came forward offering to help her with the children, the family had not been able to form a viable plan to care for the children.
Finally, the guardian ad litem testified that, although Ray Dawn and Quartyis had a family that really loved them, that family was unable to provide them with structure or guidance. She was concerned that the children had not been provided with a consistent and permanent home. She testified that the children needed a permanent plan that could be achieved through an open adoption. She recommended that permanent custody be granted to CSB.
In light of this evidence, this Court cannot conclude that the juvenile court abused its discretion in denying Patricia's motion for legal custody. Further, this Court cannot conclude that the juvenile court's finding that a grant of permanent custody to CSB was in the children's best interest was against the manifest weight of the evidence. Accordingly, Tish's assignment of error is overruled.
 III.
Tish Secession's assignment of error is overruled. The judgment of the juvenile court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
BETH WHITMORE, FOR THE COURT
BATCHELDER, J., CONCURS.
BAIRD, P.J., CONCURS IN JUDGMENT ONLY.
[1] This Court cited In re Rackley (Apr. 8, 1998), Summit App. No. 18614, unreported, at 5, in support of its finding that the appellant, in Ball, lacked standing. Rackley, however, is clearly distinguishable. In Rackley, the mother was asserting that the trial court did not have jurisdiction to grant permanent custody to CSB on the grounds that the child's father had not been timely served. This Court held that the child's mother did not have standing to challenge the Court's lack of jurisdiction absent a showing that she herself had been prejudiced by the alleged error.Id.
[2] The rights of a legal custodian are subject to the residual rights of the child's natural or adoptive parents. R.C. 2151.01.1(B)(17). Residual parental rights are defined as:
 [T]hose rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support.
R.C. 2151.01.1(B)(41). The trial court retains jurisdiction over the child after an award of legal custody is made and may amend the dispositional order at any time upon its own motion or upon motion of any interested party. Section 2151.41.7(A); Rule 36(A) of the Ohio Rules of Juvenile Procedure; In re Bowman (1995)101 Ohio App.3d 599, 601-602.